**KARL, Estate of, In re: THOMPSON, Plaintiff, v. THOMPSON et, Defendants.**

Probate Court, Franklin County.

No. 161355.   Decided October 20, 1955.

Thomas A. White, for executrix and plaintiff.

Elwood L. Carpenter, Richard C. Addison, Columbus, for defendant, Hattie E. Price.

Forrest R. Dietrich, Frank A. Koenig, Worthington.

## OPINION

By WALCUTT, J.

Elizabeth Thompson died testate on August 28, 1954, in this County. Her will was duly admitted to probate and the plaintiff qualified as executrix. She gave, devised and bequeathed her property to her daughter, Hattie E. Price, and her son, Louis M. Thompson.

The executrix filed herein her petition for construction of the will, requesting the Court to give her direction on the following matters.

1. Did the testatrix intend to devise her real estate so that both residence properties located therein would be included in the part devised to her son, Louis M. Thompson, or did the testatrix intend to include in the 31 acres devised to her daughter, Hattie E. Price, the residence formerly occupied by her and presently occupied by said daughter?

2. Should the court determine that it was the intention of the testatrix to include in the 31 acres devised to her daughter, Hattie E. Price, the residence presently occupied by said daughter, in what manner should the executrix proceed to make such division?

The portions of the will pertinent to these inquires are contained in Item II and Item III thereof, which are as follows:

Item II. As my daughter Hattie E. Price, and her family now live in my home property with me, and as my said daughter has promised to continue to live with me and give me such care and attention as I may require for the rest of my life, I give, devise and bequeath to my said daughter, Hattie E. Price, thirty-one (31) acres of land, together with all buildings thereon, off the south end of my farm of about 59 acres now owned and occupied by me, and I desire that the north line of said 31 acres so devised to my daughter shall be a line parallel with the south line of my said farm, and far enough north from the south line to contain thirty-one (31) acres of land.

I also give and bequeath to my said daughter any and all household goods and any and all chickens which I may own at the time of my death.

ITEM III. As my son, Louis M. Thompson, now resides in the buildings on the north end of my said farm, I give and devise to my said son, Louis M. Thompson, the entire balance and remainder of my farm, comprising twenty-eight (28) acres, more or less, which remains after the thirty-one acres devised to my said daughter under Item II of this will.

I also give and bequeath to my said son any and all live stock, farm implements, growing crops and any and all hay, corn or other feed which I may own at the time of my death.

The matter is submitted upon the statements made on behalf of the parties, the evidence, and the briefs of counsel.

The parties stipulate that the survey submitted to the Court, which was made when the executrix was ready to convey the real estate to the devisees, shows the division of the property made by the surveyor and the location of the buildings on each tract shown by it.

Counsel for defendant, Louis M. Thompson, objected to the taking of any testimony for the reason that, where a will contains no ambiguity, latent or patent, and can be carried into effect without the aid of extraneous evidence, such evidence is not admissible to show the intention of the testator, or to give the language a meaning different from that which is expressed. The testimony was taken subject to the objection and exception of the defendant, Louis M. Thompson, which was seasonably made, and renewed.

The first matter to be determined is whether the objection of defendant, Louis M. Thompson, to the introduction of any evidence herein is well taken.

The question of the admissibility of extraneous evidence in cases of this type is a difficult one. As stated in 94 A. L. R., p. 29.

The courts and writers who have made anything like a thorough examination of the subject have been impressed with its great difficulty and with the "painful vacillation and uncertainty which have marked the course of the decisions." Gilliam v. Chancellor (1870) 43 Miss. 437, 5 Am. Rep. 498. "Upon this subject . . . there seems to be a wonderful contrariety of judicial opinion, and in many respects it is difficult to say what is the estabqlished rule." Holmes v. Holmes (1864) 36 Vt. 525.

"Perhaps the most difficult branch of the law of evidence is that which regulates the admissibility of extrinsic parol testimony to affect written instruments," says Judge Taylor in his work on Evidence, 8th ed. Sec. 1128. "Few things are darker than this, or fuller of subtle difficulties." Thayer, Preliminary Treatis on Evidence, p. 390. The present writer wholeheartedly approves the statement of Turley, J., in Weatherhead v. Sewell (1848) 9 Humph. (Tenn) 272, that the cases on this subject are often "contradictory in their principles, and it is exceedingly difficult to arrange and harmonize them."

The general rule in connection with wills is stated in Page on Wills, Vol. 4, Sec. 1617, p. 622:

Since both wills and testaments are required to be in writing, no part of either can be created by oral statement. As we have seen, the intention of the testator is always to be deduced from the words actually

written in the will.  In determining the testator's intention, the true purpose of the inquiry is to ascertain not what he meant to express apart from the language used, but what the words he has used do express. Accordingly, when there is no dispute as to what words were written in the will, it is a fundamental principle that extrinsic evidence can not be received to show that the testator intended something outside of, and independent of, such written words, to add words to those in the will, to contradict its language, or to take words away from those in the will, even though the court may believe that the actual disposition of the testator's property which results through changing circumstances was not contemplated by him.

However, the author goes on to state:

The Courts sometimes go farther, and say that extrinsic evidence is inadmissible to explain or to vary the unambiguous terms of a written will.  Statements of this sort are misleading.  The meaning and application of the terms of the will can not be understood until the property and beneficiaries have been identified, which can be done only by extrinsic evidence; and, in many instances, until the court understands testator's situation with reference to his property, the natural objects of his bounty, and his contemplated beneficiaries.  Evidence of this sort explains the meaning of the will; and, not infrequently, this meaning is varied to the extent that the will evidently means something different, when read in the light of admissible extrinsic evidence, from the meaning which it appeared to have without such evidence.

As to the admissibility of extrinsic evidence where the will is ambiguous Page further states (p. 628):

The question of admissibility of parol evidence, therefore is generally raised where the will, either upon its face, or by reason of imperfect description of the subject-matter of the gift or the object of testator's bounty, is ambiguous or uncertain.  It is often stated, as a general principle, that evidence of extrinsic circumstances is admissible to aid in interpreting a will which is ambiguous.  This rule is so general as to be of little value since questions as to what constitutes such an ambiguity as to require consideration of extrinsic evidence in order to ascertain the testator's intent are almost as numerous as the variations which can be conceived for testamentary dispositions.  As previously pointed out, the mere statement of such a general rule is also somewhat confusing, because in many cases the ambiguity does not appear until extrinsic evidence is received; some courts holding that it is only in such cases that extrinsic evidence can be considered in the construction of the will.

The intent of the testator must be gathered from all of the provisions of the will.

The intention of the testator is to be gathered from the whole will, that is, from all of the provisions,—including codicils, if any,—considered in the light of every other provision, as an entirety.  The construction given to any part of the will should conform to its general scope and purpose, each of the parts being construed with the others to make a consistent whole. * * * As is sometimes expressed, the intent is to be ascertained from a full view of everything within the "four corners of the

instrument" in light of the circumstances surrounding the testator at the time of the execution of the will. In this respect what the testator has said, as well as what he has forborne to say, should be ascertained. **41 O. Jur., 600, Sec. 469.**

\* \* \*

In case of ambiguity or uncertainty in any provision thereof, the entire will is considered, and, if consistent, each and all of the provisions thereof are to be given full effect. Words deliberately used in a will are presumed to have been placed there for a purpose and can. not arbitrarily be ignored; they must be given a meaning to the effect the intention of the testator, if such intention can be ascertained and no rule of law violated. Therefore, if a clause of a will or codicil is susceptible of two constructions, one of which is in harmony with the remaining provisions and the other at variance therewith, the court will, of course, assume that the correction is one which will harmonize with the various provisions and will sustain the seemingly natural disposition of testator's property as disclosed by the language used, and as gleaned by all the circumstances and surroundings of the testator at the time of the making of the will or the codicil. **41 O. Jur., 605, Sec. 470.**

It is frequently said that on the matter of the introduction of extraneous evidence there is a distinction between latent and patent ambiguities. **41 O. Jur. 612, Sec. 480:**

The general principle is firmly established in Ohio, and generally, that extrinsic evidence is admissible, where there is a latent ambiguity arising out of extrinsic circumstances, to resolve the ambiguity and aid in the interpretation or application of the will. As a latent ambiguity is only disclosed by extrinsic evidence, it may be removed by such evidence.

The rule, as sometimes stated, that extrinsic evidence is not admissible where the will contains no ambiguity does not mean that evidence of extrinsic circumstances may never be introduced where the will, on its face, contains no ambiguity. Indeed, this manner of stating the rule begs the question, for it can not be determined whether or not the will does contain a latent ambiguity until extrinsic evidence has been introduced. Some extrinsic evidence is necessary in every case to identify the persons and property referred to in the will and to enable the court to apply the words of the will to the matters to which it relates.

As a part of Item II of the will, the testatrix says:

And I desire that the north line of said thirty-one acres so devised to my daughter shall be a line parallel with the south line of said farm, and far enough north to contain thirty-one acres of land.

This is what is called a precatory provision. In **Fenn, et al., v. Vott, 11 Abs 625,** Washburn, J., in commenting upon precatory provisions in a case where it was sought to establish a trust by such language, said:

In early times the rule in England was that a request in a will was considered prima facie imperative; but the modern rule in England and most of the states is that a mere request does not import a command; the test in every case is whether the intention of the testator is

manifest and mandatory in favor of the object of his bounty, or is merely suggestive and advisory to the first taker.

In determining whether the language used in this will was the expression of the mere wish or was in the nature of an imperative direction or command to do a certain thing, we must necessarily take into consideration the circumstances existing at the time the language was used. * * *

In this case it is clear that the provision, "and I desire that the north line of said thirty-one acres," etc., was a mere expression of wish on the part of the testatrix and should not defeat her obvious intent.

In Item II of the will the testatrix is careful to insert the provision:

As my daughter, Hattie E. Price, and her family now live in my home property with me, and as my said daughter has promised to continue to live with me and give me such care and attention as I may require for the rest of my life, I give, devise and bequeath, etc.

In Item III, she says with equal clearness:

As my son, Louis M. Thompson, now resides in the buildings on the north end of my said farm, I give and devise to my said son, etc.

These provisions could not have been meaningless in the will, and they must be given consideration in determining decedent's intention.

The evidence developed in the case shows that Mrs. Price and her family did live in the home with testatrix for many years, did care for her during all of that time and during her last illness with cancer, from which she eventually died, and did care for the mother as stated in the will. The evidence further shows that the son, by his own admission, did not care for his mother except for some occasional assistance, particularly toward the end of her life.

It is further clear from the testimony adduced that the house on the north part of the premises, which had been the residence of the son for thirty or more years, had been built by him, but that the mother paid at least one-half or more of the cost of such home, and the son says, "She told me that if I'd build up there, she'd give me the two acres. But she never give me no deed for it. She said, 'A deed I ain't going to give to no one,' so that is it."

It is clear from evidence presented that testatrix on repeated occasions admitted her obligation to her daughter and had said that the property in which they lived together was to be her daughter's property on her death.

The son-in-law says that when he built the brooder house in 1947, he had asked his mother-in-law if where he built it it would be safe on his wife's property, that she said that it was, and that he communicated this information to the son, who made no reply.

It further appears that there was a line fence, running along the garden north of the house to a point back of the barn. At one time the testatrix asked her son to determine for her "where the center of the place come." He said that he measured this distance from the middle of State Route 161, with a cloth tape-line, and that the center line came at a point south of where the surveyor's stake was located when the property was surveyed. It seems to be conceded that the sur-

veyor's line came some fifty-five and one-half feet south of the house in which Mrs. Price, the daughter, lived. It is significant that the additional land over one-half, specified by the testatrix for the daughter would take a strip of land on the north side of the south half of several feet in width.

It would seem clear that the testatrix was endeavoring so to divide the farm that the home occupied by her and her daughter and something near half of the land should go to the daughter.

The further fact can not be ignored that all parties assumed, until the survey was made, that the one set of buildings was on the land devised to the son and the other on the land devised to the daughter. And it seems wholly irreconcilable with the conduct of the testatrix that she intended that the daughter receive only a barn and an outbuilding on the land given to her.

That this was the understanding is evidenced by the fact that the appraisers, in their inventory and appraisement, said:

Note of Appraisers:

By request we have appraised the above premises in two parts, as follows:

1. 31 acres off south end, including residence thereon known as 5709 Karl Road, Worthington, Ohio ___ _____ $18,000.00
2. 28.33 acres, being entire premises described above less 31 acres off south end, including residence thereon known as 5825 Karl Road, Worthington, Ohio _____ $17,000.00

If we are to hold that the property is to be divided by the surveyor's line, then we have, in face of the manifest intention, as expressed by the language of the will and otherwise, to remember the daughter for her care of the mother, a situation where the daughter, who had done all this work, would receive thirty-one acres with no habitable building, as against 28.33 acres with two houses and two sets of buildings to the son, and that in addition thereto the son, who, by his own admission, had permitted the daughter to assume by far the major portion of the care of the mother, a cancer patient, would have with these buildings a tract of land approximately as large as the daughter's but, with frontage on two improved roads, one of them a state route, where the daughter's tract fronts only on one road, and that not the state route.

Apparently the son, Louis M. Thompson had no quarrel with the description in this appraisal, which was approved on December 28, 1954, as he filed no exception to it and did nothing to correct it, if it were in fact wrong.

If the Court in construing this will

should place itself in the position of the testatrix and as far as possible think as she thought, and if by so doing the testator's intent becomes clear, that intent should be given effect, and no artificial or legalistic rule appropriate when intent is not clear be allowed to defeat that clear intent (44 Abs 52).

and if

the will should be read with a view to the situation and circumstances of the testator in reference to the subjects of his disposition and the objects of his bounty. (25 C. C. [V. 8] 492),

it can not be possible to say that there was not a latent ambiguity in this will. There being such an ambiguity, the introduction of extraneous evidence to discern the intent of the testatrix was proper, and the ruling of the Court permitting such evidence is adhered to.

Therefore, the finding of the Court is that the testatrix intended that the residence in which she and her daughter made their home was to be included in the device of the land to the daughter.

As we have said before, the expression of the desire that the line between the two tracts should "be parallel with the south line of said farm, and far enough north from the south line to contain thirty-one acres of land" is merely precatory and must not be so construed as to defeat the manifest intent of the maker of the will. However, it is possible to divide this property by a line, or lines, which shall be parallel to the south line. And this can be done, placing the north line of the south tract at a point at or near the old fence line, which enclosed the garden, running it back some 300 feet, which the evidence showed was its original length, or back of the barn, and then going south to a point where a line extended west would include thirty-one acres of land.

The Court, therefore finds (1) that the testatrix did not intend to devise her real estate so that both residence properties located thereon would be included in the land devised to the son, but did intend to include in the thirty-one acres devised to the daughter the residence formerly occupied by her and presently occupied by the daughter, and (2) that it was the intention of the testatrix that the line separating the two tracts devised should be laid out in accordance with the suggesion above, so as to include the residence and the garden, which the son says was always north of the house, and the other buildings used in connection with the home. For this purpose a re-survey should be made of the land.

Entry may be drawn accordingly.